ANNIE E. SMITH v. POSTAL TELEGRAPH-CABLE COMPANY.

(Filed 18 November, 1914.)

1. Telegraphs — Mental Anguish — Funeral Postponed—Addressee's Duty— Negligence—Trials—Evidence.

In an action to recover damages against a telegraph company for the negligent delay in delivering a telegram from A. S. Adams to Annie E. Smith, reading, "Baby died this evening. Come," delivered to the husband of the plaintiff, the addressee, the evidence tended to show that the

husband wired back to the sender to ascertain the name of the deceased baby, and was informed in reply that it was the 1-year-old baby of the sender, the plaintiff's brother. The plaintiff acknowledged receiving the two messages, and there was evidence tending to show that other telegraphic correspondence had passed between the parties, wherein the sender stated that the funeral of the child would be postponed on plaintiff's request, of which the plaintiff denied knowledge; and with further evidence that the plaintiff had ample time after receiving the messages to have had the funeral postponed and attended the burial. *Held,* it was the duty of the plaintiff to have had the funeral postponed and attended it, had she received the message to that effect and could reasonably have done so, which presented an issue of fact for the jury under the conflicting evidence; and upon an affirmative finding thereon, the plaintiff's recovery of damages occasioned by not attending the funeral will be denied.

## 2. Same—Measure of Damages—Nominal Damages—Trials—Instructions.

Where damages for mental anguish are sought in an action against a telegraph company for negligent delay in the delivery of a death message, in an action brought by the addressee, and there is evidence tending to show negligence on the defendant's part in failing to deliver the message with reasonable promptness, and that the addressee could have had the funeral of the deceased postponed and attended it, it is *Held,* that the negligence of the defendant, if established, would be a tort arising from its failure to perform a public duty, and that nominal damages, at least, would be recoverable, and such additional damages as the plaintiff may have suffered up to the time she first had the opportunity to attend the funeral; and a charge is held erroneous that fails to instruct the jury upon the plaintiff's duty to have had the funeral postponed and attend it, under the circumstances of this case.

## 3. Same—Proximate Cause—Special Instructions—Appeal and Error.

Where in an action against a telegraph company to recover damages for its failure to promptly deliver a death message, there is evidence tending to show that at the time it was received for transmission the sender was asked for a better address, which he could not give, and a service message was delivered to him thereafter stating that the party addressed could not be found and asking for a better address, which the sender promised to obtain; and that he obtained and gave the correct address several hours thereafter, but too late for the addressee to come, and which was promptly forwarded by the defendant, resulting in the prompt delivery of the first message; and there is further evidence that the messenger boy of the defendant at the terminal point was negligent in not promptly finding the addressee and delivering the first message, it is held to be erroneous for the trial judge to refuse to give a prayer for special instructions on this phase of the case, presenting the question of proximate cause, which was not cured by the general charge given in the case.

BROWN, J., concurs in result.

APPEAL by defendant from *Lane, J.,* at June Term, 1914, of GUILFORD.

This action was brought to recover damages for an alleged delay in the delivery of a telegram filed with the defendant at 2:30 o'clock p. m.,

on 23 June, 1913, addressed by A. S. Adams, at Angier, N. C., to Annie E. Smith, *feme* plaintiff, High Point, N. C., which read as follows: "Baby died this evening. Come." At the time of its delivery to the operator at Angier, he asked for a better address—the correct street and number—and was told that it was not remembered at the time, and to "Send it anyway," which he did. At 3:38 o'clock p. m., the operator at Angier was notified by a service message that the telegram to Mrs. Smith had not been delivered, "as unable to locate sendee," and was handed to A. S. Adams at 4 o'clock p. m., as stated by the operator, but, as stated by A. S. Adams, at 6 o'clock p. m. Adams was not positive about it, and testified according to his best recollection. Adams was then asked for the correct address—the street and number—but told the operator he did not know it, but would get it and give it to him, which, he testified, was done by him that night, but too late, as he admitted, to send the reply message that night, as it was after 9 o'clock or after office hours. The operator told him that he could not get it through that night, but would do so the next morning, and after the office opened the next morning, about 9 o'clock, he sent the message with the correct street address. After this and some time that morning, he notified Adams that the first message had been delivered. There was no delay in sending the message on the morning of 24 June, 1913. The message was: "Angier, N. C., 24 June, 1913. Better address mine 23d, Adams to Smith, is 403 Grimes Street." There was evidence that the first message reached Annie E. Smith between 10:25 and 11 o'clock on the 24th. The following messages passed between the parties afterwards:

1. High Point, N. C., 24 June, 1913, W. A. Smith to Arthur Adams, Angier, N. C., sent at 8:25 a. m.: "Give full name of person died by wire at once."

2. Angier, N. C., 24 June, 1913, A. S. Adams to W. A. Smith, sent at 9:50 a. m.: "My baby about a year old."

3. High Point, N. C., 24 June, 1913, Annie E. Smith to Wiley Young, care of Young Drug Store, Angier, N. C., sent at 10:25 a. m.: "Be there tomorrow morning. Hold Cyrus's remains out."

4. High Point, N. C., 24 June, 1913, sent at 10:27 a. m. to Angier, N. C., service message: "Yours signed Adams delivered this a. m., after holding it over."

5. Angier, N. C., 24 June, 1913, A. S. Adams to Annie E. Smith, 403 Grimes Street, High Point, N. C., sent at 10:54 a. m.: "My baby dead, not Cyrus. Wire at once if you want to come."

6. High Point, N. C., 24 June, 1913, Annie E. Smith to A. S. Adams, Angier, N. C., sent at 12:15 p. m.: "Sorry, but cannot come on account of delay of first telegram."

Mrs. Annie E. Smith, one of the plaintiff's, testified: "I have a brother named Cyrus, 13 years old. He is my baby brother. When I got the first telegram I did not know what to think, because the name was not on it, only Adams. I didn't know which one of my brother's babies it was. My husband wired back before he ever delivered the telegram to me—before he came back to deliver the first telegram he wired back for the full name, and then I got that telegram after my husband wired back, 'Give full name of person dead by wire at once.'"

There was evidence of negligence in the delivery of the first telegram to Mrs. Smith, as her name was in the High Point directory and the messenger, while trying to deliver the message, was told where she lived, and there was evidence which tended to exculpate defendant. The evidence also tended to show that there were three trains, at that time, which left High Point, N. C., connecting at Durham, N. C., for Angier, N. C. The first left High Point at 6:27 a. m., and reached Durham at 9:25 a. m.; the second left at 9 a. m. and reached Durham at 3:25 p. m., and the third left High Point at 9:20 p. m. and Greensboro at 12:50 a. m. and arrived at Durham at 3:25 a. m. The through train from Asheville passed High Point at 3:40 in the afternoon and arrived at Durham at 6:25 p. m. Angier is 41 miles from Durham, and there were two trains from Durham; one left the latter place for Angier at 7:30 a. m., arriving at Angier at 9:30 a. m., and the other at 3:30 p. m., arriving at Angier at 5:38 p. m. All these were passenger trains, and the most direct route from High Point to Angier is by way of Durham.

There was evidence that the *feme* plaintiff had a brother named Cyrus, about 12 years old, and that the child who died was her nephew, and that the time for the funeral of the deceased child had been fixed at 4 p. m. of 24 June, 1913.

The defendant requested the court to charge, substantially, that if the jury found by the greater weight of the evidence that the delivery of the first message was delayed, and that defendant, after it found that it was unable to deliver the message to the sendee, asked for a better address, which plaintiff unduly delayed to give, and that the delay in delivering the message was caused proximately by the failure of plaintiff to give a better address, they would answer the first issue "No." This the court declined to do.

The jury returned the following verdict:

1. Did the defendant carelessly and negligently fail to deliver the telegraphic message, as alleged in the complaint? Answer: Yes.

2. If the message had been delivered in a reasonable time, would the plaintiff have attended the funeral of her nephew, as alleged in the complaint? Answer: Yes.

3. What damage, if any, has the plaintiff sustained on account of mental anguish caused by the negligence of the defendant? Answer: $200.

Judgment thereon and appeal by defendant, after reserving all exceptions taken during the trial.

*J. A. Barringer for plaintiff.*
*Brooks, Sapp & Williams for defendant.*

WALKER, J., after stating the case: The telegraphic correspondence between the parties shows that the first message in the series, in the transmission and delivery of which negligence is charged against the defendant, was handed by the messenger to the husband of the plaintiff some time before 8 :25 o'clock a. m. on 24 June, 1913, as the husband, W. A. Smith, wired back to A. S. Adams, at Angier, for the full name of the person who had died, which was received at Angier at 8 :25 a. m. He would not have sent such a message had he not known that some one had died, and he could only have received this information from the telegram of Mr. Adams, announcing that "baby died this evening." Mrs. Adams testified that her husband received the first message and afterwards delivered it to her, but before doing so he had inquired for the full name of the child.

We do not understand why either the husband, W. A. Smith, or his wife, Annie E. Smith, who sues in this case, should have understood that the first message, from A. S. Adams to Mrs. Smith, referred to her young brother Cyrus, as he was 13 years old, and she knew that her brother, A. S. Adams, had an infant child. She further said: "When I got the first telegram, I did not know what to think, because the name was not on it, only Adams. I did not know which one of my brother's babies it was." And still further: "On 24 June, 1913, we got several telegrams from Mr. Adams. The baby that died was my nephew; a boy, and my brother's son, and was 1 year old. It was between 11 and 12 o'clock on 24 June, 1913, when I got this telegram. About 11 o'clock on 24 June I got another telegram. That was the second one I remember. I got the one announcing the baby's death just a few minutes before I got any other. The other telegram stated the full name. I just do not remember what the other telegram said. My husband received it." She also stated that the reason that they wired for the full name was that the first message was signed merely "Adams," and "we sent back for the name on the other telegram." She did not remember whether she received a telegram reading, "My baby about a year old." She was much "torn up and broken down" by the fact that she could not be at the funeral, was the reason for her forgetfulness. She said: "I knew it was one of my brother's babies. When I got the

first telegram I did not think it was my brother that was dead." She denied sending the telegram in care of Young's Drug Store, stating that she would be there at 11 o'clock the next day, and "to hold remains of Cyrus out," and never heard of it before, and did not remember the telegram stating that she could not come. She did not "remember anything about any telegram except the first one, and never sent any telegram, but just found out it was her brother's baby." She afterwards said that she did not remember whether she authorized any one to send the message to Wiley Young. There was much other evidence of the same nature. It appears, though, that she was informed of the identity of the child as early as 12 o'clock on 24 June, 1914, and could have taken the Asheville train passing High Point at 3 :40 p. m., arriving at Durham at 6 :25 p. m., leaving there at 7 :30 a. m. the next day and arriving at Angier at 9 :30 the same morning. There was also a train leaving High Point at 9 :20 p. m., arriving at Greensboro about 30 minutes later, connecting with the train which leaves Greensboro at 12 :50 a. m., and which arrives at Durham at 3 :25 the same morning. A train then leaves Durham for Angier at 7 :30 a. m., arriving there at 9 :30, as above stated. These were the train schedules when the telegrams were exchanged between the parties, and plaintiff admits that she could have taken the Asheville train at 3 :40 p. m. on 24 June, or the midnight train and stayed in Durham that night, reaching Angier the next morning at 10 o'clock, as she said, or 9 :30, as defendant's witness testified.

If plaintiff had admitted sending and receiving all the telegrams, or even that she authorized them to be sent, and that she received the answers, or if the jury had found that she did, we think she could not, in law, have recovered for any mental anguish caused by her inability to attend the funeral, because she had an opportunity to do so, as she had received the telegram from Mr. Adams, giving her full information and asking her to wire at once if she wished to come, and this was notice to her, especially when considered in connection with his telegram that he would postpone the funeral for her arrival the next day, as she could not have reached Angier on the 24th, and he must have known it. She should, therefore, have taken the train at 3 :40 p. m., or at midnight, for Angier. But she denies sending any of these, and admits that she received only the first two of the series, and then too late to attend the funeral, which was to take place the afternoon of the same day at 4 p. m. She testified, as stated, that she "did not remember anything about any telegram except the first one." We would, therefore, have to resort to defendant's testimony for any proof in regard to these matters, and we are forbidden to use it, unless to the extent that it tends to support the plaintiff's case.

But even if plaintiff sent and received all the telegrams, the defendant would be liable to her, in tort, for some damages on account of the negligent delay in delivering the first message on 23 June, as there is evidence that the messenger, Joe Ridge, went to the house of William Smith, brother-in-law of plaintiff, as early as 4 p. m. on 23 June, and there received from him information as to the correct street address of the plaintiff, but for some reason failed to deliver it until the next morning. It is true that there is evidence tending to show that no such information was given, but this conflict in the testimony was for the jury to settle. If they find that there was negligence, she is entitled, at least, to nominal damages for the breach of duty (*Hocutt v. Telegraph Co.*, 147 N. C., 186), and to such additional damages as she may have suffered up to the time she first had the opportunity to attend the funeral, and time to avail herself of it. If she had it at 12 o'clock on 24 June, she could not increase the damages by her negligent failure to go when she could do so. *Edwards v. Telegraph Co.*, 147 N. C., 127. We said in *Hocutt v. Telegraph Co., supra,* referring to 2·Joyce on Electric Laws, secs. 941, 942, and 943: " 'Nominal damages are a small or trivial sum awarded for a technical injury due to a violation or invasion of some legal right and as a consequence of which some damages must be awarded to determine the right. Thus, though no actual damage may result from a breach of the contract by a telegraph company in negligently failing to promptly deliver a message, yet nominal damages may be awarded. And as a general rule in such cases only nominal damages can be recovered, unless some substantial damage be shown, and the negligence of the company is the proximate cause of the damages suffered. Actual damages are those which are given as a compensation to a person injured by the wrongful act of another, commensurate with the actual loss or injury sustained.' Joyce Electric Law, secs. 941, 942, 943. When the plaintiff discovered that the agent had made a mistake, and that by his negligence she was about to suffer damage, the law imposed the duty upon her to use such care and diligence as a person of ordinary prudence under the circumstances would have used to prevent the threatened damage or to minimize it. The rule has been thus stated and applied to cases of delayed telegrams: The duty rests upon all persons, for whose losses others may be liable to respond, to take all reasonable measures to diminish the damages that may occur. This principle applies to all who may claim indemnity from others for losses, either upon express contracts or for torts. So, in cases where a person has been injured by the failure to deliver a telegraphic message or by an error in transmission thereof, and he stands in a position to suffer further loss, in addition to that already incurred, he should exercise reasonable efforts to make the loss as light as possible,

and there can be no recovery of damages for any loss which might have been averted by the exercise of such effort," citing also, for the last proposition, 2 Joyce on Elec. Law, sec. 972, who adds that if the injured party has exercised reasonable care to prevent the damage which would otherwise result, the mere fact that his efforts might have been more judicious will not enable the company to escape the consequences of its negligence. Another author says: "Compensation for a wrong is limited to such consequences as the injured party could not have avoided by reasonable diligence. All other consequences are regarded as remote. The rule is the same in cases of contract and cases of tort. . . . He who has it in his power to prevent an injury to his neighbor and does not exercise it, is often, in a moral if not a legal point of view, accountable for it. The law will not permit him to throw a loss resulting from a damage to himself upon another, arising from causes for which the latter may be responsible, and which the party sustaining the damage might by common prudence have prevented. The party who is not chargeable with a violation of his contract should do the best he can in such cases, and for any unavoidable loss occasioned by the failure of the other he is justly entitled to a liberal and complete indemnity." Hale on Damages, p. 64. And Sutherland on Damages, sec. 88, says: "The law imposes upon a party injured by another's breach of contract or tort the active duty of using all ordinary care and making all reasonable exertions to render the injury as light as possible. If by his negligence or willfulness he allows the damages to be unnecessarily enhanced, the increased loss—that which was avoidable by the performance of his duty—falls upon him. This is, a practical obligation under a great variety of circumstances, and as the damages which are suffered by a failure to perform it are not recoverable, it is of much importance." If the plaintiff had the opportunity to leave on the afternoon or midnight train, after Mr. Adams had offered to postpone the funeral, it was her duty to do so and lessen the damages.

We find, though, by an examination of the record, that these views were not explained to the jury at all, and the right to recover full damages was made to turn altogether upon the negligence in regard to the delivery of the first telegram only, whereas the charge should have covered both aspects of the case. The damages awarded embraced those flowing from the mental anguish caused by her not attending the funeral, when the jury may have found, had they been properly instructed, that she could have attended the funeral after she received the last message, if she had desired to do so, and therefore suffered no mental anguish on that account. The court made the barest and briefest reference to this feature of the case, and then only in stating the contention of the defendant, and even then confined the case entirely to

the conduct of the defendant in respect to the first telegram. There was positive error in allowing the jury to assess damages based upon the negligent delay in delivering the first telegram, and for mental anguish caused by her inability to attend the funeral, without reference to the opportunity she had of doing so after she received the telegram offering to postpone the funeral for her arrival, if the jury found that such was the case. It laid down too broad a rule.

We think, also, that the court should have given the instruction as to proximate cause requested by the defendant, or one substantially similar. *Hargrave v. Telegraph Co.*, 60 S. W., 689, which is much like this case. The instruction requested by defendant was substantially correct, and should have been so given, as decided in *Baker v. R. R.*, 144 N. C., at p. 42, where a similar prayer was submitted and where we said: "The general charge of the court in respect to the degree of care required of the defendant's servant in approaching the crossing with the train would perhaps have been fully sufficient in the absence of any request for more specific instructions. *Boon v. Murphy*, 108 N. C., 187; *S. v. Jackson*, 13 N. C., 563; *Patterson v. Mills*, 121 N. C., 258; *Cowles v. Lovin*, 135 N. C., 488; *Yow v. Hamilton*, 136 N. C., 357. It is also true that the court is not obliged to adopt the very words of an instruction asked to be given, provided in responding to the prayer it does not change the sense or so qualify the instruction as to weaken its force. *Brink v. Black*, 77 N. C., 59; *Chaffin v. Mfg. Co.*, 135 N. C., 95. These are rules which are observed in all appellate courts. But it is an equally well established rule that if a request is made for a specific instruction, which is correct in itself and supported by evidence, the court, while not required to adopt the precise language of the prayer, must give the instruction, at least in substance, and a mere general and abstract charge as to the law of the case will not be considered a sufficient compliance with this rule of law," citing *Knight v. R. R.*, 110 N. C., 58; *Chesson v. Lumber Co.*, 118 N. C., 59; *S. v. Dunlop*, 65 N. C., 288; *Young v. Construction Co.*, 109 N. C., 618.

The defendant would not be liable in damages if its negligence did not proximately cause the injury, and it is practically the same to say that liability would not arise if the delay in delivering the telegram was not caused proximately by its negligence, for the delay was the injury or breach of duty, which it is alleged caused the damages.

The learned judge defined proximate cause and made some general reference to it, but no real application of it, and we do not think the charge shows any sufficient or substantial response to the specific prayer of the defendant, which was expressly refused, as requested by it, and at the time it was submitted.

Mental anguish which is caused by the failure to deliver, or delay in delivering a telegram is a legitimate ground upon which to base a recovery of damages, as we have so often held, beginning with *Young v. Telegraph Co.,* 107 N. C., 370 (decided by a unanimous Court composed of *Chief Justice Merrimon* and *Justices Davis, Shepherd, Avery,* and *Clark*), down to *Betts v. Telegraph Co., ante,* 75. We believe there has been no formal dissent from the doctrine first declared by this Court in 1890 to the present time, a period of nearly a quarter of a century. But while the principle has been firmly established by this Court, and, we may add, by many others, and, where not so established by judicial decision, has been made the law by legislative enactment, the courts should be careful to see that it is justly administered and is not made the pretense for the redress of fictitious or fanciful wrongs, as mental anguish may be so easily simulated and its existence is so difficult for the defendant to disprove. The defendants are entitled, therefore, to be protected against false claims and excessive damages by a firm and intelligent exercise of the supervisory power of the trial judge. As was said by the Court in *McAllen v. Telegraph Co.,* 70 Texas, at p. 246: "In this case it seems that the plaintiff's mental anguish was not the result of any real or adequate cause. It does not appear that the father was dead, or in such condition as demanded the personal presence or attention of the son. On the contrary, the sorrows of the plaintiff were imaginary, and were caused by the failure on the part of the father to send the carriage to Pena, which the affectionate son attributed to the fact that the father was dead or too dangerously ill to attend to ordinary business, when in truth the failure was due solely to the fact that no request to send forward the carriage had been received. The deduction of the son was not logical, or, at all events, the occurrence might have been well accounted for on some other hypothesis than the disability of the father. If grief or sorrow produced by things unreal, mere figments of the brain, are held to give a cause of action for a breach of contract or tort, an individual of a somber or glowing imagination would often be entitled to large damages on account of mental suffering, while others of a buoyant fancy for the same breach of duty would not be entitled to anything; and damages, instead of being measured by the rules of law as applied to the real facts, would largely depend upon the fertility of the imagination of the suitor." We are not suggesting that there is anything of the sort in this case, but merely sounding a warning, as a precautionary measure against any abuse of a just principle. The plaintiff may have a good cause, and is free to establish it before the jury. The doctrine of mental anguish is perfectly safe and sound, and can be successfully defended against attack by the simple application of common-law prin-

ciples; but our own long line of decisions, and the steadily growing opinion of the other courts in favor of it, is sufficient evidence of its wisdom and permanence, and there is no danger of its working any wrong or injustice if verdicts are supervised as in other cases, when compensatory damages for mental anguish, and also those which are purely exemplary, are allowed by the law.

We conclude, for the reasons given, that the case should be tried again.

New trial.

BROWN, J., concurs in result.